

# NUMBER 13-19-00215-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

MOLLY MCARDLE'S L.L.C.
D/B/A MOLLY MCARDLE'S
SPORTS POOL & KARAOKE,                                    Appellant,

v.

FRANCISCO LARA III, INDIVIDUALLY
AND AS REPRESENTATIVE OF THE
ESTATE OF TAMMY ALVARADO,
MARCO LARA, MORANDA LARA,
AND PATRICK ALVARADO,                                     Appellees.

## On appeal from the County Court at Law No. 1
## of Nueces County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Longoria and Tijerina**
**Memorandum Opinion by Justice Tijerina**

Appellees Francisco Lara III, individually and as representative of the estate of

Tammy Alvarado, Marco Lara, Moranda Lara, and Patrick Alvarado (collectively Lara), filed a dram-shop claim against appellant Molly McArdle's L.L.C. d/b/a Molly McArdle's Sports Pool & Karaoke (Molly's) for the wrongful death of their mother Tammy Alvarado. The jury returned a verdict in favor of Lara, on which the trial court entered judgment. Molly's appeals this judgment, arguing: (1) the evidence was legally insufficient to support the jury's answers to question one (whether the negligence of Molly's caused Tammy's death) and question three (whether Molly's directly or indirectly encouraged its employees to violate the law regarding the serving of alcohol to intoxicated persons); (2) the evidence was legally insufficient to support the jury's damages award; and (3) "a new trial was required on the basis of harmful error in admitting certain expert testimony and in giving a spoliation instruction." We reverse and render.

## I.  BACKGROUND

This litigation arises out of a fatal head-on auto collision that occurred at 1:30 a.m. on March 26, 2014. Martin Gomez was driving his Camaro in the wrong direction on a one-way road while intoxicated. Gomez's vehicle collided with a vehicle driven by Randy Irwin. Tammy, who was in the front passenger seat of Irwin's vehicle, died instantly while Irwin was severely injured.[1] Lara sued Molly's under § 2.02 of the Texas Alcoholic Beverage Code, alleging it served alcoholic beverages to Gomez when it was apparent to Molly's that he was obviously intoxicated to the extent that he presented a clear danger to himself and others. *See* TEX. ALCO. BEV. CODE ANN. § 2.02.

### A.  Gomez's Testimony

---

[1] Gomez pleaded guilty to intoxication assault and intoxication manslaughter. *See* TEX. PENAL CODE ANN. §§ 49.07, .08.

Gomez testified that on the evening of March 25, on his way to pick up his friend, Aaron Mathew Lopez, he consumed a 32-ounce Budweiser in his vehicle, which he claims gave him a "buzz." Gomez and Lopez headed to Molly's to have some drinks. Gomez recalled pulling into Molly's parking lot "and then after, that it's a complete black-out." Gomez stated that the next thing he remembers is waking up in a hospital room. Gomez did testify, however, that he was impaired when he left Molly's that evening, and he had no recollection of consuming any alcohol after leaving Molly's. Gomez was presented with his bar receipt bearing his signature but stated the signature appeared messy and did not look like his usual signature.

According to Gomez, about a month or two after the fatal accident, Lopez spoke to him about that night. Lopez explained to him that Gomez "had a couple of beers" that night and that "somebody might have bought [them] a shot, too."

## B. Lopez's Testimony

Lopez testified that he and Gomez walked straight to the bar when they arrived at Molly's around 11:00 p.m. Gomez ordered two beers—one for each, and Gomez's receipt was admitted into evidence. The receipt had a timestamp of 12:04 a.m. and displayed a total of four drinks: two 32-ounce beers and two shots. Lopez asserted he paid for those two shots in cash. Lopez stated that the receipt is indicative of the time Gomez left Molly's, but the time Gomez left was a disputed issue in trial. It was Lopez's opinion that Gomez showed no signs of intoxication throughout the night.

Thereafter, Lopez stayed at Molly's and continued to consume alcohol. Lopez's receipt was admitted into evidence and displayed that Lopez ordered and paid for a total

3

of eight drinks. Lopez claimed, though, that he bought those drinks for patrons at the bar whom he was unable to identify. He reiterated that Gomez did not consume any of those drinks. According to the receipt, Lopez closed his tab at 1:16 a.m., and the bartender called him a cab. Lopez began working at Molly's in October 2016 and was still employed there at the time of trial in March 2019.

## C.    Antonio Farias's Testimony

Molly's previous bar manager Antonio Farias testified that he was working at Molly's on March 26. Farias stated that every person employed at Molly's, even those not involved with alcohol, is certified by the Texas Alcoholic and Beverage Commission (TABC).[2] To obtain certification, all employees attended a TABC-approved seller training program and completed a seller-serving training course. According to Farias, he fired any bartender that did not take TABC trainings, rules, or guidelines seriously or did not monitor how they served alcohol: "These bartenders who would improperly serve or try and overserve their friends, I caught it real fast. I would tell them, no, that is not what you're going to do here . . . . And I would pull out their drawer, count down their money, and I'd send them off."

On March 25, Farias observed Gomez and Lopez arrive around 11:00 p.m. He further observed Gomez purchase and consume a 24-ounce beer, and a shot of Crown Royal mixed with Watermelon Pucker. Farias testified that Molly's had at least seven security cameras inside and four outside, which were in working order. When Farias learned of the fatal accident from law enforcement, he reviewed the surveillance video of

---

[2] Farias stated that even the janitorial staff, DJ, and maintenance crew that temporarily come in for repairs are all TABC certified.

that night. He stated it was his opinion Molly's was not responsible for over-serving Gomez. Farias claimed he did not discuss the video or play it for his bar employees. Although Farias claimed he subsequently provided officers with the video surveillance, he was unable to recall to which agency he provided the video, and the video was not located before trial. Lara therefore requested and received a spoliation instruction. Based on the instruction, the jury was permitted to consider that the evidence on the surveillance video would have been unfavorable to Molly's on the issues of whether Gomez was obviously intoxicated, to the extent that he presented a clear danger to himself and others, and whether Molly's over-served Gomez (question one). The spoliation instruction did not permit the jury to make any inferences on the encouragement issue (question three).

## D. Sergeant Benjamin Ramirez's Testimony

Sergeant Benjamin Ramirez with Texas Highway Patrol testified that as the custodian of records, he reviewed the collision report. According to the report, Gomez was traveling in the opposite direction on a one-way road. The Camaro's crash data recorder revealed that Gomez was traveling 101 miles per hour 2.5 seconds prior to the crash. He applied hard braking and slowed to 82 miles per hour one half-second prior to the crash. Gomez was extricated from his vehicle and transported to the nearest hospital due to the injuries he sustained. The interviewing officer indicated that Gomez admitted to consuming alcohol before the accident, but there was nothing in the report indicating that Gomez displayed signs of intoxication.

## E. Experts' Testimony

Lara's forensic toxicologist expert Greg Jellick testified that he chose midnight as

the time of Gomez's last drink based on the testimony and receipt, and that he based his expert opinion on that assumption. Jellick stated Gomez's blood was drawn at 2:16 a.m. and 3:39 a.m.[3] At 2:16 a.m.—less than one hour after the accident—Gomez's blood draw showed 0.235 grams of alcohol per 100 milliliters of blood. Based on his expertise and his review of the available data, Jellick opined that Gomez had fourteen to twenty-six standard-serving drinks, and based on the midpoint of that range, he concluded that twelve standard-serving drinks were "unaccounted for" by the testimony. Jellick further explained that, at this level of intoxication, "even chronic drinkers will demonstrate issues with their speech and their ability to perform fine motor skills . . . issues with their maintaining balance and their center of gravity." He stated the observable symptoms of impairment would have been "obvious even to the lay person."

Forensic toxicologist Sarah Kerrigan, Ph.D., testified on behalf of Molly's. Kerrigan opined that a forensic toxicologist could not accurately determine Gomez's blood-alcohol content when he left Molly's because the time of Gomez's last drink was unknown. At 3:39 a.m.—two hours after the accident—Gomez's blood draw showed 0.221 grams of alcohol per 100 milliliters of blood—almost three times the legal limit of 0.08. It was her opinion that anyone with a blood alcohol concentration this high would not be able to operate a motor vehicle safely.

Kerrigan stated that, based only on the testimony that was provided to her and on the alcohol per volume percent for liquor and beer, Gomez had at least 6.1 to 6.7

---

[3] The 2:16 a.m. blood draw was part of a standard drug screen administered when an individual is admitted to the emergency room while the 3:39 a.m. sample was the legally-mandated blood draw that was given to DPS for analysis. *See* TEX. TRANSP. CODE ANN. § 724.012(b)(1)(A).

standard-serving drinks that were accounted for before leaving Molly's: one 32-ounce Budweiser prior to Molly's; one 24-ounce or 32-ounce beer at Molly's; and one shot, which was a combination of two different liquors. However, Kerrigan further explained that she used the widely scientifically-accepted Widmark formula to estimate the number of drinks that were in Gomez's system at the time of his blood draw, and that this formula indicated greater consumption: "Knowing his weight of 250 pounds and assuming a volume of distribution for an average range for males, we can estimate that he had approximately anywhere between 11 and 14 drinks in his system at the time of the blood draw at 3:39." Thus, it was her opinion there were several drinks not accounted for by the testimony.

Kerrigan further explained that even heavy-set alcohol drinkers (Gomez was 6'1 and weighed 250 pounds) would display signs of intoxication at 0.2 including "behaving loud, obnoxious, sort of loss of inhibitions, sometimes a disheveled appearance, slurring their words, difficulty with muscular movements," among others. She explained that the models of Jellick would be invalid if Gomez continued to drink after leaving Molly's.

**F.      Verdict**

The following questions, among others, were submitted to the jury: "Did the negligence, if any, of [Molly's] proximately cause the death of Tammy Alvarado?" (Question one); and "Do you find that . . . [Molly's] directly or indirectly encouraged its employee(s) who served and/or supervised the service of alcohol to [Gomez] at the time of the occurrence in question to violate the law regarding the selling or providing of alcoholic beverages to intoxicated persons?" (Question three). The jury answered "Yes" to questions one and three.

The jury found that Molly's breached its statutory duty of care and that Gomez breached his common-law duty of care. *See id.* § 2.02(b)(1). The jury concluded that Molly's was sixty percent responsible, and Gomez was forty percent responsible. It further found that Molly's required its employees to attend, and the employees attended a TABC-approved seller training program, but Molly's encouraged those employees to violate the law regarding the selling or providing of alcoholic beverages to intoxicated persons. This latter finding prevented a take-nothing judgment on the verdict based on the "safe harbor" defense in § 106.14(a) of the Texas Alcoholic Beverage Code. *See id.* § 106.14(a). The trial court's April 3, 2019, final judgment awarded Lara $381,499 plus prejudgment interest and costs.

On May 3, 2019, Molly's filed a motion for judgment notwithstanding verdict and notice of appeal, asserting that Lara presented no evidence of the following: (1) Molly's served Gomez when it was apparent to Molly's that he was obviously intoxicated to the extent that he presented a clear danger to himself and others; (2) any negligence committed by Molly's proximately caused the accident; or (3) Molly's, either directly or indirectly, encouraged its employees to violate the law regarding the service of alcohol to intoxicated persons. The trial court denied Molly's motion. This appeal followed.

## II. TEXAS DRAM SHOP ACT

The Texas Dram Shop Act imposes civil liability on providers of alcoholic beverages for damages resulting from the sale or service of alcohol to a person who is obviously intoxicated. *See id.* §§ 2.01–.03; *F.F.P. Operating Partners, L.P. v. Duenez*, 237 S.W.3d 680, 683 (Tex. 2007) (explaining the history of Texas Dram Shop Act). Under

the Texas Dram Shop Act, providing, selling, or serving an alcoholic beverage may be the basis of a statutory cause of action upon proof that:

> (1) at the time the provision occurred it was apparent to the provider that the individual . . . was obviously intoxicated to the extent that he presented a clear danger to himself and others; and

> (2) the intoxication of the recipient of the alcoholic beverage was a proximate cause of the damages suffered.

TEX. ALCO. BEV. CODE ANN. § 2.02(b). Section 2.03 of the act further provides that:

> The liability of providers under this chapter for the actions of their employees, customers, members, or guests who are or become intoxicated is in lieu of common law or other statutory law warranties and duties of providers of alcoholic beverages. This chapter does not impose obligations on a provider of alcoholic beverages other than those expressly stated in this chapter. This chapter provides the exclusive cause of action for providing an alcoholic beverage to a person 18 years of age or older.

*Id.* § 2.03 (formatting omitted).

> The Dram Shop Act contains a "safe harbor provision," which provides:

> (a) For purposes of this chapter and any other provision of this code relating to the sales, service, dispensing, or delivery of alcoholic beverages to a person who is not a member of a private club on the club premises, a minor, or an intoxicated person or the consumption of alcoholic beverages by a person who is not a member of a private club on the club premises, a minor, or an intoxicated person, the actions of an employee shall not be attributable to the employer if

>> (1)  the employer requires its employees to attend a [TABC]-approved seller training program;

>> (2)  the employee has actually attended such a training program; and

>> (3)  the employer has not directly or indirectly encouraged the employee to violate such law.

*Id.* § 106.14(a). Under this provision, the owner of an establishment is not liable for the

actions of its employee—specifically, over-service—so long as the above three elements are established. *Id.* According to the Texas Supreme Court, providers of alcoholic beverages have the burden of proof as to the first two elements. *20801, Inc. v. Parker*, 249 S.W.3d 392, 395 (Tex. 2008). On the other hand, the plaintiff bears the burden of proof as to the third element. *Id.* "A plaintiff can show encouragement not only by direct evidence that the provider knowingly ordered or rewarded over-service, but also by circumstantial evidence that the provider engaged in behavior that a reasonable provider should have known would constitute encouragement." *Id.* at 398. In meeting its burden of proof, a plaintiff need only show that the employer acted negligently. *Id.* Evidence of encouragement may include evidence that the provider ordered or rewarded over-service, modeled inappropriate behavior by himself serving alcohol to obviously intoxicated people, failed to punish employees for over-service, or set "an excessively high minimum sales quota without regard to the number of patrons." *Id.*

Thus, the focus is on whether a provider directly or indirectly encouraged its employees to over-serve alcohol to its patrons. *See id.* at 398; s*ee also Yarbrough v. McCormick, No.* 04-17-00283-CV, 2018 WL 3129459, at *4 (Tex. App.—San Antonio June 27, 2018, no pet.) (mem. op.) ("[I]n deciding whether an employer should be held vicariously liable for injuries caused by an intoxicated patron, the focus must be on whether the employer directly or indirectly encouraged its employees to over-serve alcohol to patrons."). "This safe harbor provision was established by the Texas Legislature to shield employers against vicarious liability for the actions of employees acting within the course and scope of their employment." *Id.*

### III.  STANDARD OF REVIEW

By its first issue, Molly's argues the evidence is legally insufficient to support the jury's negligence findings. Specifically, Molly's claims that there was legally insufficient evidence that Molly's served Gomez when it was apparent to Molly's that he was intoxicated to the extent that he presented a clear danger to himself or others. Next, Molly's argues the evidence is legally insufficient to support the jury's encouragement findings. Issue two addresses the jury's failure to determine that Molly's established the safe harbor affirmative defense contained in § 106.14(a) of the Texas Alcohol and Beverage Code. *See* TEX. ALCO. BEV. CODE ANN. § 106.14.

The test for legal sufficiency is whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We view the evidence in the light most favorable to the fact finding, indulging every reasonable inference that would support it and disregarding contrary evidence unless a reasonable factfinder could not. *Id.* at 822. Evidence is legally insufficient to support a disputed fact finding when (1) evidence of a vital fact is absent, (2) rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of the vital fact. *Id.* at 810.

Lara, as plaintiff, bore the burden of proof to establish the essential elements of his dram-shop claim. *See Duenez*, 237 S.W.3d at 684. As the provider of alcoholic beverages, Molly's had the burden of proof as to the first two elements of its safe harbor

11

defense, but Lara bore the burden of proof as to the third element. *See Parker*, 249 S.W.3d at 395. To challenge the legal sufficiency of the evidence to support a finding on which an adverse party bore the burden of proof as in this case, the appellant must show the record presents no evidence to support the adverse finding. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983); *see also Rev 2 Props. v. Skip's Rest. Equip.*, *Inc.*, No. 13-17-00409-CV, 2018 WL 6815476, at *8 (Tex. App.—Corpus Christi–Edinburg Dec. 27, 2018, no pet.) (mem. op.).

## IV. DISCUSSION

### A. Safe Harbor Affirmative Defense

Assuming but not deciding that the evidence was sufficient to support the jury's findings that Molly's served Gomez when it was apparent to Molly's that he was intoxicated to the extent that he presented a clear danger to himself or others, *see* TEX. ALCO. BEV. CODE ANN. § 2.02(b), because it is dispositive, we determine whether the evidence is legally insufficient to support the jury's encouragement findings. As previously stated, the spoliation instruction did not permit the jury to make any inferences on the encouragement issue.

As a defendant asserting an affirmative defense, Molly's bore the burden of proving its compliance with the first two elements of § 106.14 at trial. Once these requirements were met, the burden then shifted to Lara to prove that Molly's directly or indirectly encouraged the employee who served Gomez to violate the Dram Shop Act. *See Primera Enters, Inc. v. Autrey*, 349 S.W.3d 167, 169 (Tex. App.—El Paso 2011, no pet.); *Five Star Int' Holdings, Inc. v. Thomson, Inc.*, 324 S.W.3d 160, 165 (Tex. App.—El Paso 2010, pet.

12

denied); *see also* TEX. ALCO. BEV. CODE ANN. § 106.14(a). Lara does not dispute that Molly's established the first two elements of § 106.14(a). *See City of Keller*, 168 S.W.3d at 810.

Accordingly, the burden shifted to Lara as the negligence claimants to prove that Molly's directly or indirectly encouraged its employees to violate the Dram Shop Act. *See Parker*, 249 S.W.3d at 394; *Primera*, 349 S.W.3d at 170. Lara's argument that Molly's indirectly encouraged its employees to serve intoxicated individuals is based on the following evidence: (1) the last call to purchase drinks is at 1:50 a.m., but according to Lara, you have to "chug it down" by 2:00 a.m.; (2) Molly's offers drink specials throughout the night for the purpose of getting liquor out that was not selling; (3) employees walk around the bar with a tray of shots, which encourages patrons to drink shots at a reduced price; and (4) there is no evidence that if patrons paid cash for shots those shots still appear on a person's tab. Lara did not support any of these contentions with citing legal authority. *See* TEX. R. APP. P. 38.1(i).

First, Molly's last-call time to purchase drinks ten minutes before closing does not suggest that Molly's encouraged its employees to over-serve alcohol to intoxicated patrons. *See* TEX. ALCO. & BEV. CODE ANN. § 29.01 (permitting the sale of alcohol until 2:00 a.m.). Gomez collided at 1:30 a.m., so the fact that Molly's last-call time is at 1:50 a.m. is irrelevant to this case. Similarly, Lara cites no authority supporting the contention that offering drink specials alone is evidence of encouraging employees to violate the law, and we find none. *See* TEX. R. APP. P. 38.1(i). We therefore reject this contention.

Next, Lara did not explain how an employee walking around Molly's selling shots equates to the encouragement of over-service to intoxicated patrons, and we decline to adopt Lara's bare assertion. *See id.* Lara must have provided evidence that Molly's engaged in behavior that a reasonable provider should have known would constitute encouragement. *See Cianci v. M. Till, Inc.*, 34 S.W.3d 327, 330 (Tex. App.—Eastland 2000, no pet.) (holding that testimony from a server that the manager told her to keep serving alcohol to obviously intoxicated people until "he made his decision on whether they needed to be served or not" raised fact question about whether the employer encouraged its employees to violate law and precluded summary judgment); *see also Yarbrough*, 2018 WL 3129459, at *5 (refusing to hold a provider liable for encouragement to over-serve patrons when two employees were drinking on the job); *Williams v. Bad-Dab, Inc.*, No. 01-11-00102-CV, 2012 WL 3776347, at *6 (Tex. App.—Houston [1st Dist.] Aug. 30, 2012, no pet.) (mem. op.) (holding that although evidence the patron was "talking very loud," "swaying from side to side," and had glassy, red eyes indicated his intoxication, it was not evidence that the provider "encouraged its employees to continue serving him").

Lastly, Lara asserted Molly's encouraged its employees to violate the law because there is no evidence that if patrons pay cash for shots those shots still appear on a patron's tab. First, "proving a negative is always difficult and frequently impossible," *State Farm Mut. Auto. Ins. v. Matlock*, 462 S.W.2d 277, 278 (Tex. 1970), and "[i]t would indeed be extremely difficult for a provider to establish that it in no way directly or indirectly encouraged its employee to violate the law." *Parker*, 249 S.W.3d at 397. Nonetheless, Farias testified that if shots were sold for cash by personnel wandering through the bar,

those shots were still tallied on a patron's check. Additionally, Lopez testified that he paid cash for the shot that appeared on Gomez's receipt. Thus, this evidence belies Lara's argument.

**B.    Summary**

To challenge the legal sufficiency of the evidence to support a finding on which Lara bore the burden of proof, Molly's must have shown the record presented no evidence to support the adverse finding. *See Croucher*, 660 S.W.2d at 58. Viewing the evidence in the light most favorable to the fact finding, we conclude that there was no evidence that Molly's knowingly ordered or rewarded over-service or engaged in behavior which a reasonable provider should have known would constitute encouragement. *See Primera*, 349 S.W.3d at 170–71 (concluding that bar proved "safe harbor" defense as matter of law when there was no evidence that bar "knowingly ordered or rewarded over-service" or "engaged in behavior which a reasonable provider . . . should have known would constitute encouragement"). We must be "mindful that if courts interpret 'encourage' too broadly, a provider will not receive the protection—and incentive to send their employees to training—that the Legislature conferred." *Parker*, 249 S.W.3d at 397. In this case, Lara did not describe or provide any testimony by anyone associated with Molly's that shows any factual basis to presume that Molly's encouraged its employees to violate the law. *See Primera*, 349 S.W.3d at 170–71; *see also Williams*, 2012 WL 3776347, at *7. Consequently, there was neither direct evidence nor circumstantial evidence that Molly's engaged in behavior which a reasonable provider under the same or similar circumstances should have known would constitute encouragement. *See Primera*, 349

15

S.W.3d at 171; *see also Williams*, 2012 WL 3776347, at *7. Because Lara failed to present evidence of "encouragement" which would rebut the safe-harbor defense, Molly's legal sufficiency challenge on its affirmative defense must be sustained. *See Parker*, 249 S.W.3d at 394. We sustain Molly's first issue with respect to the issue of encouragement. Having sustained issue one, we need not address the remaining arguments. *See* Tᴇx. R. Aᴘᴘ. P. 47.1.

## V.    Cᴏɴᴄʟᴜsɪᴏɴ

We reverse the trial court's judgment and render judgment that Lara take nothing on their claims against Molly's.

JAIME TIJERINA
Justice

Delivered and filed on the
15th day of April, 2021.